and Mr. Callaghan, whenever you're ready. Thank you, Your Honor. My name is Michael Callaghan. I'm with the law firm of Neely & Callaghan. It's my pleasure to represent Living Lands in this case. Now, while I know everybody wants to get to the intricacies of RCRA and the Clean Water Act and all the codes of federal regulation that they're in, I just wanted to take a couple of minutes and say why we're here. And I come to you in an odd place. I was the very first Cabinet Secretary for the West Virginia Department of Environmental Protection. I was there when the statute passed to make it a Cabinet-level position instead of a division. If you picked up on my briefs, and especially our reply brief, I am not shy about criticizing the Department of Environmental Protection. They have woefully failed to exercise their duties to protect the citizens of West Virginia with respect to coal mining, and specifically with respect to the bonding program. Now, not the first time I've said that. I testified in front of the United States Senate Environmental Resources Committee on two occasions, and I said West Virginia's bonding system is broke. I got sued as the Cabinet Secretary. I testified in federal court and said it was broke. It is a broken system. That is 2002. Today is 2024. Nothing has changed. The system is woefully broken. This case is a perfect example, and I'll get into a few more details here. But the bottom line on this case, the coal mining was done in the 1970s. A $10,000 bond was supplied to clean up the reclamation of this site. The current estimate by WVDEP is over $2 million to fix this site. $2 million for a $10,000 bond. That is woefully broken, and that burden goes back to the state of West Virginia. Now, my client Living Lands, they are a couple of retired people who decided enough is enough. There's been too much contamination and pollution in the state of West Virginia. What can we do about it? So they devoted a little bit of their time and a little bit of their money to find ways. I'm sorry, your client is? Living Lands. And who did you say that was? I said there are a couple of the members of Living Lands. It's a real estate investment firm, right? It is. Okay. But it's more of an investment firm to find property contaminated collateral, get it cleaned up, and put it to a better use. The particular site we're looking at, and it's in my home county of Nicholas County. It's in the country. But this particular site is near Summersville Lake, a new state park coming in. It is a potentially great property to be redeveloped and reclaimed if the coal mining is done and cleaned up properly the way it should have been done to begin with. Now, Living Lands, they came in and they took an option on this property with the idea of suing the coal company. Are they like a nonprofit, Living Lands? It is not. It's a for-profit. But the idea was to sue Brady Klein Coal Company up to their insurance assets. And what we planned to do was go back to the 70s, identify all the insurance policies, and then collect those and make claims on them and file so that the property could be cleaned up to its proper state. So when my clients got involved in this, they went to the property and they saw DEP had done some reclamation on the property. And quite frankly, they were excited about that because they thought they had a partner in cleaning the property up. So when we go to the property, we find a couple of things that are just quite shocking to a former cabinet secretary for the Department of Environmental Protection. One of them, acid mine drainage was straight piped into a creek. That is a no-no. Acid mine drainage, again, high iron manganese, straight piped to a creek in the state of West Virginia. The impoundments to DEP. Counsel, I'm worried that you only have a minute left. And I don't know if you were going to get to the claim in front of us, I think it's count two on the RCRA claim. Did you want to say anything about that? My co-counsel is going to address that. He's got 15 or 10 minutes, I believe, coming up. But I just wanted to paint the big picture for you and say DEP, West Virginia DEP, my former department, I was a number one cabinet secretary. It is run amok. Mr. Callahan, aren't you talking to the wrong audience here? We've got statutes in front of us that appear on their face to be constitutional. At least there's no constitutional challenge that we have to consider. Shouldn't you be talking to the legislature instead of us? Well, Your Honor, the answer to that is yes, and I have. But with respect to this particular case, I think this court can hold DEP accountable for the rules that are on the books. Now, I'll give you an example. When this case started, DEP filed a brief and said RCRA does not apply to coal sites. Well, that is contrary to every provision of statutory construction in the history of our country. RCRA applies and it says it does. So DEP took the position that RCRA does not apply. Now, in our latest brief, our reply brief, we showed this court where DEP is not applying the appropriate solid waste standards. So, again, I'm giving you the overview. Mr. Donovan will hit the specifics. All right. But I'm just saying it's time to hold DEP accountable to do their job. All right. Let's get to the specifics. This would be Mr. Donovan. Thank you, Your Honor. Again, my name is Michael Donovan, and I'm appearing on behalf of Living Lands. And, Your Honor, I will take one minute of my time here to get you to RCRA. So that will be. Originally, the concept of a solid waste management statute was brought to the United States by President Eisenhower returning from Europe after World War II. And he said, look, Europe and its reconstruction has decided to do away with open dumps. We should do that here in America. That statute was first discussed and introduced into Congress in 1959, enacted in the early 60s. It was the Solid Waste Disposal Act. But it was just a grant program to study and develop and come up with options. Fifteen years later, this case involves the very principles of RCRA Subtitle D that were enacted in 1976. And, Your Honors, I want to say to you what a momentous occasion that was. RCRA Subtitle D is frequently overshadowed by the much more popularly known hazardous waste and underground storage tank provisions of the act. But RCRA Subtitle D addresses the solid waste disposal. And we became the first nation on this planet to commit itself to eliminating every open dump in this nation. And number two, we committed ourselves to a program that all solid waste disposal shall be done in a manner that presents not even a reasonable possibility of an adverse impact on the environment. And quick questions. And the EPA approved that plan, right? Plan? You mean the West Virginia Solid Waste Management? Yes. Indeed they did. Indeed they did. And in that plan was a certification by the West Virginia Attorney General that said this statute and regulations have all of the authority necessary to accomplish the federal goals and minimum compliance. And part of, just to follow up on my colleague's question, right? So, as I understand it, a big part of the argument is that the West Virginia plan is actually inconsistent with RCRA because it has this mining exception, right? Actually not. No. That's not your argument? Yes. Actually not. So the state plans are consistent with RCRA? The plan itself, and therein comes the problem we tried to address. It's complicated, of course, by the district court's first decision. Maybe you can just say for me, is your position that the state plans that are at issue here and the mining exemption, those are consistent with RCRA? What the state statute does, Your Honor, is it takes mining waste out of the West Virginia Solid Waste Management. Right, and I understood your argument in your brief to be that because it does that, the state plans are actually not consistent with RCRA. But if you are conceding that they are consistent, that would be, you know, narrow the things in front of us. I'm afraid that either or just simply does not work here. It almost always does. The question is, what statutes it referred to, do they accomplish the federal goal? And the answer is no. They do not. Okay. They took it out of one statute and put it, said, this group of waste is going to be dealt with by another statute. You know what, can I ask you like a super technical question about this, just where we are in this case? Yes. Let me just go through a couple of things. As I understand it, you are appealing the district court's grant of summary judgment on count two of your complaint. Is that right? That is correct. Great. Okay. And in granting summary judgment on count two of the RCRA claim, the district court said that there was, in this record, no evidence of a violation of a contaminant that exceeded a maximum contaminant level because the plaintiffs had pointed only to beryllium, and beryllium does not have a maximum contaminant level. And in your appellate brief, you didn't challenge any of that. So why doesn't that take care of this case? Because that addresses only one of the two possibilities that exist under the act, Your Honor. The question is, there are federal open- I understand, but you also don't argue in your brief that the state standards are any stricter when it comes to beryllium than the federal standard. It's not a beryllium issue at all, Your Honor. Well, that's the only evidence of a contaminant you put into the record, so how can it not be a beryllium issue? Beg your Honor's pardon, but the record is spleet with evidence of solid waste and leachate from solid waste being released from every facility on the site. Every online facility, the impoundments, the ditches, the so-called drying pits, all online facilities in which solid waste has been placed and has been leaking out for as long as that site has existed. I needn't tell this Court what happens when you put liquid in an overhaul on the ground. It dissipates into the environment, and that's what's happening there. So the record is spleet with evidence of leachate and solid waste being released into the environment from solid waste management facilities at this site. The question before this Court is, West Virginia committed itself, irrevocably committed itself, to enact a program of solid waste management that complies with the minimum requirements of Record Subtitle D. Our argument is not about the federal open dumping standards of those in 257, Your Honor. Our argument is they violated the commitment in their own program that all federal solid waste would be treated in a manner, disposed in a manner that does not present any reasonable possibility of adverse impact on the environment. They simply don't do it. They simply don't. And the question here is that question precisely. It's complicated in this case by the Court's earlier decision, which is for the first time in 45 years, and so the statute, according to this nation, has said that the industrial wastewater exclusion in the statute applies to releases way before the point source, way before the point source that discharges into surface water. Your Honor, before we get to the point source exemption, so the District Court, in addition to this actual finding, did say in the alternative there were these exemptions that would cover it even if there had been evidence of a violation, and the District Court relied on two separate independently sufficient exemptions. One is the one you're talking about, but the other one was the mining exemption. The one for mining sites, coal mining sites. Why are you looking at me like you've never heard of this before? I'm getting it from your brief. I beg your pardon, Your Honor. Are you talking about mining exception in the federal statute? No, there isn't one in the federal statute. That's correct. There's a state statute. The state statute, it has – The District Court relied on that exemption. Under that exemption, none of this is covered. Why was that incorrect? Because nowhere in your brief do you say the exemption wouldn't apply to these facts. The question that is presented here is, Your Honor, may a state redefine the federal term solid waste and then say we're complying with that part of it but not the other part? May it take the federal definition, cut a piece out of it, and say we'll do this but we won't do that? The answer is no. Well, the EPA approved their plans with the exemption and said these are fine. A plan? If you want to go sue the EPA, sue them. The plan included certification that they would meet all minimum federal standards, Your Honor. A certification by the Attorney General of the state and a certification by the governor of the state that said they would meet the federal minimum requirements. That certification is part of the package. Did EPA pursue it into whatever other statutory schemes they wanted to regulate that particular waste? No. They relied on the state's assertion that we are applying and we commit ourselves to meet these minimum requirements for this federal program, which they simply do not do. And that issue is the issue that compels this court's attention. It is simply a question of whether a state may apply to the United States government and receive decades, hundreds of millions of dollars of money from the people of the United States and then not intentionally not comply with the minimum requirements imposed on that program by Congress. It's just unthinkable. But that's what happens here. So the question is, can mining waste under state law be treated in a way that doesn't comply with federal minimum standards because they put some exception in a single statute? Of course not. They committed themselves for the entire universe of federally defined solid waste to that federal goal. All disposal of solid waste will be in a manner that doesn't present even a reasonable possibility of adverse impact on the environment. They do it with other solid waste, but with mining, coal mining waste, they simply don't. And that question is the one presented by this case. And it's an unfortunate set of facts, but it is absolutely true. And the question is not whether they violated federal open dubbing standards. You're correct. We do not pursue that question before this court. The question is they violated state commitments. They violated the basic commitment of the state. Is this like a contract claim or something? I don't understand. Did they violate the state statutes? Or are you just saying they violated their commitments? As we said in our brief very explicitly, Your Honor, there's nothing in record that says you have to regulate mining waste under some particular state statute. It doesn't matter whether you regulate it under the Solid Waste Management Act. Have you ever had a statutory violation of any kind in this case or not? I believe there's been a statutory violation. Okay, what statute was violated?  What statute was violated? BRCRA subtitled the error. You just said you're not raising a federal claim. I said it didn't involve the federal open dubbing standards under 257. Okay. It does involve a violation of 4003 and 4004 of the Act. It very clearly does. Okay, but can I just bring you back to the district court saying you have no evidence of a violation of any RCRA standard in this case? And you don't challenge that on appeal. So I think I have to take for granted that there's no evidence that there was any contaminant that exceeded any level set under the federal law. Because that's what the district court said, and you didn't appeal it. Yes, that is correct. We did not appeal the finding under 257. We do not. Okay, so that's not the statute that was violated. So what statute was violated? 4005 of the Federal Act requires that they're all open dubbing. There are two basic requirements of RCRA subtitled the error. They are embodied in the Act itself. One of them is a congressional exercise of the interstate commerce power, and it applies nationwide. No consent of the state is required. That is the open dubbing prohibition in 4005. It simply says, one, all future open dubbing is prohibited, and number two, all existing open dubs will be converted into facilities that provide safe disposal. Okay. That is the congressional exercise of the interstate commerce power in 4005. Thank you. Can I ask you just to hang on for one second because you are past time? Judge Floyd, do you have any questions? Well, I have one question. The open dubbing regulations that eliminate any reasonable possibility of adverse effects on health or the environment, those Virginia and West Virginia analogs, it's not preempted by the RCRA, is it? Sorry, Your Honor, I'm unclear on the question. Well, Rick is talking about open dubbing regulations. It's not preempted. It doesn't preempt the West Virginia state law, does it? No, the West Virginia state law is the second component of RCRA subtitle B is it created a model federal program, and the states could voluntarily agree to commit themselves to meet that goal, to participate in that program. It's entirely voluntary. 4003 and 4004. EPA has to approve the plan, right? Right. Okay. They submit this so the state, understanding the state says this is our plan, and they submit it to the EPA, and the EPA approves it or disapproves it, right? That's correct, Your Honor. Okay. And once they approve that plan, the state has committed itself irrevocably to meet the federal minimum requirements. That's the phrase Congress uses in the state, the minimum requirements of this model federal program. West Virginia does not meet those. Still should be talking to us. Well, then you should still be talking to the legislature, not us, right? Absolutely not, Your Honor. The question is, as presented by, as the United States Supreme Court said, and as the Fifth Circuit addressed in Cox, the United States Supreme Court, and Pennhurst, a state's voluntary acceptance of federal funds and committing itself to meet the conditions and requirements of that is an enforceable obligation against the state. And they committed themselves to that and did not do it. That's the issue now before this court. They committed themselves to meet the federal minimum standards of Title D, and they're not doing it. Thank you very much. Mr. Foreman, when you're ready. Yes, Your Honor. Good morning, and may it please the Court, my name is Isaac Foreman. And together with my colleague, Skylar Matthews, we represent the Secretary of the West Virginia Department of Environmental Protection, Mr. Harold Ward. I'll start by responding briefly to Mr. Callahan's presentation. His service as prior secretary was certainly appreciated. And just note that at no time during Mr. Callahan's service as secretary or any other subsequent secretary did the West Virginia Department of Environmental Protection issue solid waste permits for mine reclamation activities. The reason that the West Virginia Department of Environmental Protection is on the site at all is because a historical coal mine operator ceased operations, didn't conduct the reclamation itself, forfeited its reclamation bond. And now as a function of state and federal law, the DEP is required to come out and conduct that reclamation. The work that's being done there is an effort to reduce the impact of acid mine drainage on the state of West Virginia. And it's being done pursuant to an NPDES permit with which the agency is in full compliance. That's my response briefly to Mr. Callahan's point. I do have a question about the permit. So do the permits cover specific outlets or is it the entire property? So the permit map is actually at page 269 of the Joint Appendix. And you can see the permit boundary. It identifies the outlet. So if you look at the map that's submitted with the permit that's part of the record in this case, you have at the very bottom what you call an outlet or an outfall. That's where effluent comes out and is tested and has to meet effluent limitations contained in that permit. And you have a permit boundary above that. And within that permit boundary are the two ponds in which sediment is collected and from which sediment is periodically removed. And at the very top of that is what's called the lime doser. That's essentially a box with granulated limestone that is dispensed into the water in order to reduce the acidity of that acid mine drainage. So to answer your question directly, Judge Benjamin, the permit boundary, which is the permit encompasses the lime doser, the two sediment ponds, the outlet at the bottom, and the drying cells where when the sediment is removed, it's placed to dry. So both ditches. And that is a ditch one, a ditch two. I know ditch one is covered. I was wondering about ditch two. Ditch two is not a part of the permit, and there is some confusion as to ditch two. Ditch two was never litigated. Claims related to ditch two were never properly raised in district court. In fact, at summary judgment, Living Lands tried to amend their complaint to add a ditch two claim. And the district court said the district court denied leave to amend to add a claim related to ditch two because the district court said, yes, it was encompassed in your notice of violation, your pre-suit notice, but it wasn't in your complaint. It's never been litigated. And so ditch two is outside of the scope of being what's addressed, what was addressed in district court, or what's at issue in its appeal. I'm happy to – I do have some knowledge about ditch two and can answer further questions about it, but I do believe that it's outside of the scope, was outside of the court's summary judgment and outside of the issues for this appeal. There were numerous claims below, including attempts to amend, but really this appeal involves only one subpart of one claim, and that is count two. But count two was actually – had two subparts, and the second one purported to be a state law claim. And that is a claim that Secretary Ward violated West Virginia state law in the form of the West Virginia Solid Waste Management Act. The answer to that question comes from the plain and clear language of two separate exclusions that are written into West Virginia Code, section 22-15-2. That is the definition of solid waste. And West Virginia, in its Solid Waste Management Act, which is part of the plan that was submitted to and approved by the EPA, has these two exclusions. One of them I call the NPDES exclusion. NPDES is the National Pollutant Discharge Elimination System. It's the permitting regime that was created by the Clean Water Act, and it's state analog. The NPDES exclusion says solid waste does not include industrial discharges, which are point sources, and have permits under the State Water Pollution Control Act. There's no question here. It's your question, Judge Benjamin. If the court reviews the permit boundary, you can see that the permit here includes the outlet and includes everything within the permit boundary. And by the way, the definition of the term point source is quite broad. It's not the same thing as the outlet, right? The outlet at the very bottom where effluent comes out, it's sort of the very bottom of the permit boundary, and everything within it still constitutes a point source. That's also defined in West Virginia Code. I think they're making this argument about this inadvertent seepage, and that it's solid waste, and that's what's going into the contamination. Would that be considered, I guess, disposal, or is that covered under this permit also? Yes, Your Honor. And the definition of point source in West Virginia Code, it's section 22-11-3. Point source is very broad. Any discernible, confined, and discrete conveyance including but not limited to any pipe, ditch, channel, tunnel, conduit, and it goes on and on to provide a broad category of things that could be considered a point source. All of them, certainly the ditch, the ponds, the lime doser, the drying cells where we're drying the sediment, all of that falls within that permit. That's NPDES permit 1027786, and the permit map, as I've said, is part of the record, and it's contained in the joint appendix. That NPDES exclusion is on its own sufficient for this court to affirm the judgment of the district court, but there's another exclusion, and that is what I call the mine waste exclusion. And in that same provision of West Virginia Code, where the West Virginia legislature has defined solid waste, they say solid waste does not include wastes or materials resulting from the exploration, development, production, storage, and recovery of coal placed or disposed of at a facility which is regulated under Chapter 22, which is where the Clean Water Act is located, so long as placement or disposal is in conformance with a permit. No dispute here that West Virginia is in full compliance with its NPDES permit. So can I ask you just about this, the mining exception? It may be that I misunderstood your colleagues' arguments, but as I understood it, the argument as to that exemption, there was no claim that on the facts it didn't apply here. But the claim was it's sort of invalid, that that exemption under state law is invalid because it is inconsistent with the federal statute. Is that the claim as you understand it, the allegation? It's been difficult to track sort of the Living Lands allegations because I think even the district court noted this, they've been presented, and they're often changing and shifting, and it seems like shifting sands. I do understand that to be the argument today, and I recognize this was in Living Lands' reply brief. I think they said at page 26 that on its face, that exclusion in favor of coal mining does not violate any requirement of RCRA subtitle D. So if we accept that, take it for face value, and we assume the argument is that the state plan conflicts with federal law. That's how the district court understood it, right? That's what the district court thought the argument was. That is what the argument was. The argument was that the state plan conflicts with federal law. The district court understood that to be a conflict preemption argument and addressed it in the district court's opinion and addressed it accurately. And if that was right, if we thought that was right, that's the end of this. If you affirm the district court as to that, that is sufficient to affirm the grant of summary judgment. Yes, either or both of those exclusions are sufficient. And turning to their argument, being very generous, there's a way to say that, well, it's not really a preemption argument. It's an argument that we should really strain to interpret state law to be consistent with federal law to the extent that there is. But that just doesn't work when the plain and clear language of these exceptions is applied. Can I ask you about another piece of the district court's reasoning in this case, although it was in the first decision? When the district court says, first of all, there's this exclusion, the point source exclusion. But second of all, even if there weren't, there's no evidence in the record of any exceedance of any relevant chemical standard. I'm probably not saying that quite right, but you know what I mean. And that also is not challenged on appeal. Now, that was a finding made, I think, under federal law. It was not challenged on appeal. And there's also nothing in the appellate brief saying that the state standard is any stricter. That, well, that might be true under RCRA, but the state has a special rule on beryllium, which you have exceeded. So given that, if we agreed with that read of the record by the district court, would that also be sufficient grounds for affirming? It is sufficient grounds to affirm on the basis that the district court, I think it was a factual finding, but made under federal law applying those federal standards and saying there's no evidence that would support actual evidence of contamination at the site. I will say from the secretary and the agency's standpoint, that factual finding is not necessary because you don't even get there when you apply the plain language of the exclusions. I'm just trying to figure out, like, the moving pieces. It seems to me the district court made three determinations, any one of which would be sufficient to support the grant of summary judgment, that the mining exclusion applies, that the point source exclusion applies, and that anyway, there's no evidence of contamination. That's correct. And the only reason I flag as sort of an unnecessary holding is that an opinion from this court, which affirmed on that basis alone, would suggest that if there were evidence of contamination, the claim would proceed. I suppose it would depend how the opinion was written. Of course. And from the secretary's standpoint, the secretary's interest is in having those exclusions recognized as valid and enforceable and that it was never necessary. I will say I have to acknowledge something that was not fully fleshed out in our brief, and it's because it was only really in the reply that it became sort of clear that what Living Lands is doing now is not just a claim that Secretary Ward was engaged in open dumping, but in fact, a program-wide attack and saying that West Virginia is not implementing its plan consistent with federal law. And that really became clear in the reply brief. And so I would add, as Judge Benjamin, you've noted, this plan was submitted to and approved by the EPA, that the approval criteria are in 42 United States Code section 6947. EPA had to determine that West Virginia's solid waste management plan met the substantive criteria, and then it complied with federal law. And the EPA did that. But importantly, and the part that I'll acknowledge we didn't address in response because, again, it's been difficult to track the issues, is that once the EPA does that, right, once they certify a state plan as being in compliance with federal law, there's a separate procedure if a party wants to try and have that plan decertified. They file a petition with the EPA. That process is set forth in the Code of Federal Regulations. It's a 40 CFR 271.23. They file a petition with EPA. An EPA administrative law judge makes a recommendation on that decision. It then goes to the administrator. And if they believe, if a petitioner believes that the administrator has improperly rejected it, then you appeal, but not to a district court. It goes directly to a court of appeals. There's an entirely separate process. And importantly, and again, I'll acknowledge that this was not in our briefs because the arguments have been a shifting stance, that administrative process is the exclusive method by which someone can challenge the EPA's approval of a state solid waste management plan. And the exclusive nature of that review is set forth in 42 United States Code section 6976, which says that action of the administrator with respect to which review could have been had through the administrative process shall not be subject to judicial review in civil or criminal proceedings for enforcement. This is a civil enforcement proceeding in which now, for the first time really in this appeal, Living Lands is trying to challenge the administrator of the EPA's decision to certify West Virginia's solid waste management plan. This is not the forum for someone in a civil enforcement action to come and say, we think the EPA acted improperly. And in fact, the statute makes clear that there is another place where they could do that, and that is through an administrative process, an appeal potentially to this court, and that that remedy is exclusive. There are, of course, other bases on which this court could affirm, one of which was rejected by the district court, and that is that Secretary Ward is simply not engaged in the act of open dumping. RCRA does allow a citizen to bring a citizen suit to prominently enforce state law, which is what we're talking about, Part 2 of Count 2. But not just against anyone who's involved, it has to be someone who is engaged in the act of open dumping. And an additional argument that we raised below the district court did not accept is that when a state regulator, pursuant to its obligations under state and federal law, is simply going on to a site and performing reclamation in compliance with its permit, it is not engaged in the act of open dumping. The final argument that I had in favor of affirmance is one that the court has already mentioned, and that is that the district court found that there was simply no evidence of a probable risk of harmful contamination of the subject property. That's obviously another independent ground to affirm. But to sort of bring it full circle, this is an appeal from one part of one claim. It's a claim that Secretary Ward violated state law. And the answer to that question comes from the plain language, two exclusions, both of which support the district court's judgment, both of which are adequate and independent grounds to affirm. And so based on those arguments, we would ask this court to affirm the judgment of the district court. And unless the court has further questions for me, sit down. Judge Floyd, do you have any questions? No, ma'am. Thank you, Judge Floyd. This button's a little crazy down here. Thanks. Thanks to Judge Floyd. Thank you, Mr. Foreman and Mr. Donovan. Your Honor, we hear now a redefinition, and I think it addresses some confusion that the court itself has articulated here, that we are claiming the plan is inadequate or we're attacking the plan. That is not the case. And let me be direct on it. That is not the case. The plan they submitted, as I said, not only included these two statutes. It included the required certifications from the state of West Virginia that they would comply with the minimum requirements of Record Subtitle D. They had the statutory authority to do so, and they would do so. But if they're not, wouldn't it be more appropriate to file something with the administrator saying, hey, they're not following the plan? With the EPA? I mean, it seems like administratively you would file something saying, hey, you approved this plan, but they're not following the plan. I don't think the defect here is really legal ledger domain, Your Honor. What does that mean? I'm sorry. I don't know what that means. I'm embarrassed to say. Sleight of hand. Got it. And then it's not. The question is, EPA state statute. And I quote it, Your Honor. The definition in state law, an open dump that comports completely with record is any place where solid waste is disposed, is disposed in a manner that does not protect the environment. That's the definition of that state statute. That's the definition. They approved. This site is not. What about the exclusions that he just discussed? Exclusion doesn't say we're not doing it. But that mining waste doesn't doesn't isn't subject to this plan. It merely says we're doing it under another statute. And it says mine waste is not covered by Solid Waste Management Act. It's covered by these two other state statutes. But that doesn't relieve the state of West Virginia from its obligation on federal law to comply with the minimum requirements of records of penalty for something the federal government most definitely finds as a solid waste. And that's mining waste. In other words, one of the biggest decisions Congress made when it approved Subtitle D was to include mining waste in the definition of the federal definition of solid waste. It's that problem here. The problem we have here is twofold. Could it possibly be attacked by an administrative claim saying the plan as they're implementing it doesn't comply? Possibly. That's a possible avenue. But it also is very consistent with what the United States Supreme Court has said in Congress and what the Fifth Circuit said in Cox that when a state makes a commitment under a federal program to comply with federal requirements, that commitment is enforceable. And my point is it's enforceable here. To say the state secretary is not engaged in open dumping when he's placing mining waste in unlined facilities and letting it leak out into the groundwater is absurd. Of course it's an open dump. They say, but we have an exclusion. It's not this statute. It's this statute. I don't care what statute you regulate it under. You made a commitment to comply with the minimum requirements of requisite Subtitle D. And that's congressional language. These plans will not be approved unless they meet the minimum requirements for approval. And they certified they did. They certified it. By the governor's certification, by the attorney general's certification, and by submitting all these statutes. Is it the real question here they're not doing it correctly? Well, perhaps. I mean, could you possibly construct a claim and say to the EPA and say they should disapprove the plan? Perhaps. Is it also a case of a state violating an enforceable commitment it made 40 years ago that it would run its solid waste management program in compliance with the minimum requirements of federal law? That is enforceable, Your Honor. And it's enforceable by the citizen supervision that Congress itself wrote into 4005 of the act and said violations of open dumping are enforceable under citizen supervision, whether they be violations of federal law or violations of state law. And Congress itself said you can't get your plan approved unless you agree to this model federal program that says no disposal of solid waste will present any reasonable possibility of adverse impact on the environment. We have the technology to do it. And Congress committed us to it in 1976 or 49 years later. And you're looking at a site where acid mine drainage is being placed permanently disposed of in the ground. It is offensive in the extreme, and it certainly violates minimum requirements of record. Thank you very much. We will come down and greet counsel, and then we will adjourn court for the day.
judges: Pamela A. Harris, DeAndrea Gist Benjamin, Henry F. Floyd